Thanks, Elias. OK. The next case is Tension Steel Industries v. The United States, Appeal No. 17-2526, Mr. DeFrancesco, whenever you're ready. Did I say your name correctly? Yes, Your Honor. Thank you and good morning, Your Honor. May it please the Court, I'm Robert DeFrancesco on behalf of Appellate Maverick 2 Corporation. As we indicated in our briefs, we believe the lower court in this case overstepped its authority in rejecting the Department's longstanding practice regarding how it evaluates a respondent's rebates. The lower court in this case simply accepted what we believe is a flawed Court of International Trade determination in Kohler AG regarding the Department's practice and its regulations. We believe that both decisions by the Court in Tension 1 and the Court in Kohler AG to require commerce to blindly accept all reported rebates by respondents contradicts the agency's interpretation of its regulations, its past practice, and without providing the proper amount of deference to the agency interpreting its regulations. To reach this conclusion, both courts in those cases improperly interpreted the term net outlay in the Department's regulations to mean that the Department must accept any and all rebates paid by a respondent regardless of how dubious those rebates might be. In this case, the other mandatory, there's only one other mandatory respondent, Chung Hung Steel Corp. They got a zero margin, right? That is correct, Your Honor. And they didn't have any rebate. Correct, Your Honor. So, this case, the question of whether or not there's, and this is an initial investigation, not an annual review. Correct. And this is the first time that I'm aware of that the agency would be applying its interpretation to an initial investigation as opposed to an ongoing review. Correct. Both the Kohler case and the case subsequent to that were annual reviews. And the problem is that in this, for me, so you know where I'm coming from, there's a finding by Judge Gordon that there's no manipulation here. There's been no showing of any manipulation. And the various two, at least, or three of the other previous final determinations all indicate that the reason for the interpretation is to prevent manipulation. That is to say, somebody who's going to, after there's an existing anti-dumping order, oh, give a few after-the-fact rebates in order to drive the home price down, in order to, okay? And so, for me, in this particular case, and I understand there are very few of these cases left. Correct. So, this is kind of a one-off. I'm looking at it and saying the shoe doesn't fit. The reason for the interpretation, which has now been refined in new regulations that have, I think, a little more clarity about exactly what's up, that more corresponds to the two earlier cases that existed before, squared that up. So, for me, the shoe doesn't fit because there is a finding of no manipulation. The attention says I have these rebates in place well before anybody ever came knocking on my door. And so, the policy that drives your regulation is ill-served in this case. That's where I'm coming from. Thank you, Your Honor. I think to get to the question of whether there's manipulation, you still have to get over the first hurdle of does the department's regulation allow it to go behind what's going on with the rebates? And the court's decision in Tension 1 and Kohler in interpreting that regulation say no. If the rebates are granted, that's it. There's no more questions asked. Your view is that Kohler's going to deal with a manipulation case, too. Kohler isn't going to stop the manipulation. Right. That's right, Your Honor. I agree with you on that. And let me tell you also where I'm coming from so you see it. I can appreciate the way in which you chose to present your case in your brief. But when I looked at this, I read Judge Stansell's opinion in Kohler. And I said, this is a statutory interpretation. He says it's a plain meaning. Where there's a plain meaning, there's no room for a contrary regulation. Regulation is inconsistent. So, the question to me was, what's the ambiguity? And your brief sort of dances around but never exactly picks one word and says, this is it. You sort of, a little bit here, a little bit there, a little bit of this, a little bit of that. But the true fact is that in this, all throughout the gamish of all these cases, when Congress has stood up to fight, its only complaint has been over the word rebate. It hasn't talked about satisfactory proving and all the other stuff. It simply said there was, because there's no definition of an illegitimate rebate. That's where they went. I went back and read all the briefing and the other cases. So, I would have expected your brief to come in and say it's rebate, there it is, right up the line. But I didn't see that. So, I saw you sort of waffling a little bit about where the ambiguity was. Well, I think to Commerce's point, where they would view the ambiguity, at least in the regulation, is there's a portion of the regulation, actually in two places within the regulation, that says the respondent or the person coming in and claiming the adjustment has the burden of proof to demonstrate to the satisfaction of the agency that you've carried that burden, that they're satisfied. At the same time, the court's interpretation of net outlay vis-a-vis this particular rebate says, well, even if I find that you haven't satisfied me, Commerce, that you're entitled to this rebate, I have no choice but I have to accept it. Beyond that, the department's practice as it relates to rebates has always been, before the regulations were written and after the regulations were written, to say, if the terms of the rebate are not known at the time of the sale, I will deny the rebate. In this situation, going to your other point vis-a-vis really the merits, if I analyze the facts, is there room for manipulation? In this case, we have a scenario where there's no overarching document outlaying a rebate program, if you will. The only documents that identify that a rebate will be granted, if any, are in the sales documents, in the contract of sale. And they don't appear in every contract of sale.  And then what we have happen later on is the respondent in this case says, within the contract of sale, it says, if I get a price adjustment from my coil supplier, remember this is a pipe that we're welding coil, if I get a price adjustment from my coil supplier, I will pass, it doesn't say how much, if any, of that benefit on to my customer. It only says that in a few of the sales contracts, not all. However, in this case, where there were price adjustments given, some of which three years before the rebate was paid, they gathered all these different price adjustments and then allocated them across all of those sales. And in certain instances, there were price adjustments or rebates that were granted, where no price adjustment on the coil was granted at all. So they didn't follow the terms of their own program that they outlaid in those sales documents. And there's no way to tie up certain of the coil adjustments with the rebates that were granted. And there's no way for the customer, a normal rebate program, Your Honor, would lay out terms that the customer is aware of and that the customer would know, I've done something to satisfy this benefit and can actually enforce it contractually. That doesn't exist here at all. This is simply a means of the respondent being allowed to adjust its margin by providing rebates as it sees fit. You agree, ultimately, though, that there was a rebate provided, right? There was an amount of money given to the customer. There's any number of reasons why you might provide certain benefits to the customer. I might give the customer Stanley Cup tickets. It doesn't mean that that relates to the particular sale. I've just given him something of value. The dollars and cents all add up. I mean, the money was paid, so that's a question. Your point is that if this was a rebate system, it was pretty sloppy and one can't quite figure out exactly why it was happening? Correct. And in previous cases, the pineapples case being one of them, the department has looked into, again, the program itself and said, in that case, I'm going to look at the terms. Did you follow the terms? Was the customer aware of the terms? What they're looking for is manipulative behavior. Correct. And we believe that does exist here. Gordon said no showing of manipulation. I saw that over the weekend. It snapped my head back because I missed it the first time through. We are. You're not challenged. We are. The first part of our brief is about the regulation itself and whether COLA should be applied. And the second part of our brief is a substantial evidence standard. Exactly. That goes to that issue. And you have an interesting twist on that one in the light of how Tension has chosen to respond to the substantial evidence thing. Correct, Your Honor. I just understand the way you're litigating it both ways. But like I said, their practice, the Department of Commerce's practice as to how they look at these rebate programs has existed over a very long period of time and hasn't changed. And in the preamble- to not be here today. And they've chosen to modify the regulation, right? Correct, Your Honor. Correct. But throughout both in the original determination in this case and even in the regulation when they modified it, they said explicitly they didn't agree with the court's determination. They did it without prejudice when they were modifying it and they didn't think it should be taken as a- Well, I know where they are. But it is interesting that they chose from the very get-go not to stand and fight. And the reason why is because they've got a very strange language. I mean, when you talk about the adjustments, the adjustments are all post-sale. So, I mean, you're dealing with a situation where adjustments can be made after the sale. So, you're taking this initial sale in the home market, right? It's very, very important for the whole scheme. And the law allows that to be tampered with after the fact. So, oh my God, what's going to happen? Correct. And until they got the regulation a little clearer, it was clear that commerce correctly never was going to say, oh, we're going to throw anything out that happened post-sale because statute wouldn't want to do that. Correct. Correct. And that's the reason you highlighted about the extra scrutiny for these sorts of post-sale adjustments. And it applies not only to rebates. The regulation also talks about discounts. It talks about other sorts of post-sale adjustments beyond. That's what you're going to have a number of things that will affect this base home price that are going to happen after that sale was made. And so there is obviously great possibility for manipulation. Correct. And so that's the laser eye of the commerce when they're going in to look is looking for potential manipulate behavior. Correct. Frankly, Your Honor, it's that reason for that additional language within the regulation in 401B and 401G where twice it talks about it's the person requesting the adjustment has the burden of establishing for commerce the satisfaction that you've established the nature of the adjustment. So that language is there to allow them to have that additional scrutiny, which they applied, we believe, properly in the original investigation in this instance when they looked and said we'll grant some but not all because those terms were not outlined in all of these contracts of sale. I'm going to reserve the balance of my time for rebuttal. Thank you, Your Honor. Thank you. Good morning and may it please the court. My name is Kelly Slater and I'm here today on behalf of Tension Steel Industries Company, a Taiwanese exporter of oil country tubular goods or oil pipeline products. I'd like to talk about the substantial evidence standard first as opposed to legal standard. I'm going to go backwards. Now the standard of review here is de novo. It's a de novo review of the Commerce Department's decision. Substantial evidence showed on the record that Tension Steel did satisfy its evidentiary burden with respect to its claim rebates and that information was verified successfully by Commerce. Tension Steel's claim rebates were bona fide price adjustments consistent with their typical practice, being as a pass-through of rebates received from an upstream supplier that they would subsequently pass along a portion of to their customer, like Robert explained. And the record also demonstrated that there was no evidence of price manipulation, as Judge Gordon noted, in his decision in the lower court. Well, this is the first instance, is it not, in your experience, where Commerce sought to apply its interpretation to an initial investigation as opposed to an ongoing review? I'm not sure I understand. I mean, this is not an annual review. Your client did not have an anti-dumping order hanging around his neck when they began an annual review. That is correct. Your client, wherever he was, was sitting in his office, and all of a sudden Commerce showed up and said, we're instigating an anti-dumping investigation? Correct. And so my— There was no notice. Yeah, this is the first one that Commerce is saying, well, we don't have an outstanding order that somebody is trying to manipulate, but we're nonetheless going to apply our anti-manipulation regulation that exists for ongoing investigations to this case. Correct, correct. That's our position. Now, Prosperity, that's your case. What's the status of Prosperity at the moment? Prosperity is on remand. The remand results have been filed with the court and then now are going to be commented upon. Commerce did follow the court's orders under respectful protest to make— Could be a similar situation as this, but it went back now for another filing. It's only appealable up here once the final comes up. Right, right. I represent a co-plaintiff in that litigation. Okay. So why isn't the statute ambiguous, the statute and the regulations, when it comes to the term rebate? I don't think it is ambiguous. The government's position from the beginning, from Kohler straightforward, including the supplemental briefing in Kohler, the government said, well, we think there's some ambiguity in here in what constitutes a legitimate rebate. Well, but then I think what the Kohler court's response to that is, is that really a legitimacy? I don't know what the Kohler's response is. What's your response? My response to the legitimacy? Why isn't the term rebate ambiguous? Why is it not ambiguous? How do you know? I think there's a kind of common— Would you agree with me that an illegitimate rebate should not be taken account of in adjusting the price? Well, then that would depend on how you define illegitimate. Well, it was never paid. Well, then— Somebody said, you know, this is my rebate. I give the money back to the original purchaser, but they didn't do it. They had a deal where we just papered over it. It was a lie. Okay. It was illegitimate. Okay, then that's manipulation, and I think by definition you can't have a rebate unless it is paid. That's a crucial element of the nature of a rebate. It's a payment that is made. Well, but say they paid and then they got it back. They paid and then they got it back. Well, then that wouldn't constitute a rebate either. Rebates aren't paid back, Your Honor. So there's a possibility for some slippage in what constitutes a legitimate rebate, maybe. Because if there is, then there's room for an interpretation. Okay, but I think this is part of the reason why when the regulations were written they weren't taking into account the subjective evaluation of whether a rebate is legitimate or not. Is it paid or is it not? If it isn't paid, then no credit is going to be given for it, and the company has the burden of demonstrating in its books and records what that amount was, how much was paid to the customer, and how its bank account statement is reflective of paying to that customer. And I would also like to say on a related point that my colleague here was incorrect in stating that Commerce was unable to tie rebates provided to U.S. customers to particular sales transactions. Commerce was able to verify that information. It wasn't something where they took a big pot of rebate money in the financial accounts and then distributed it somehow randomly among the different sales contracts. Your adversary on the facts, which you're not doing, your adversary is challenging the factual assessment by Commerce that there was a sufficient connection. Right. That's his substantial evidence. Right, right. But you're saying Commerce actually did make that finding? They did make those connections, yes. Do you have a record site for that? Pardon me? Do you have a record site for that? Let me see. Well, you can look at the sales verification report at pages 3 to 6. Gosh, I don't know if I know the appendix number of that. I could provide that. It's the sales verification report, Commerce. I just thought you might have a site. It is a sales verification report, pages 3 through 6. 356? 3 through 6, there's a discussion of their findings. Of the decision. It's an April 2014 document, Commerce memo. Okay, thank you. Okay. The way in which your adversary is presenting the case is he asks us to say that Judge Stansell was wrong in Kohler. He made a mistake. And consequently, both of the tension decisions are mistaken because they depend on Kohler. And his argument is that the regulations that were promulgated back in 94, I think it was, that deal with making these adjustments and talk about rebates, leave open the possibility of illegitimate rebates. Rebates that are used to manipulate an existing margin to the benefit of the party that was subject to the margin. And so in order to deal with that problem, the agency has set forth a consistent interpretive tool that allows them to decide which rebates are illegitimate and which ones aren't. And your adversary is saying, what's wrong with that system? Why did Judge Stansell have the authority to say that that system couldn't exist? Judge Stansell had the authority to take a look at the plain language of the regulation, the price adjustment regulations, and decide whether a reasonable interpretation of that language could include a requirement that the customer have, the customer and the parties to the transaction have knowledge of the rebates, terms and conditions at the time of sale. The regulation simply did not support such a requirement in Judge Stansell's interpretation. The regulations as interpreted by Judge Stansell would permit manipulation, correct? Not necessarily. Well, don't say necessarily. Say I just would. Say, for example, say, for example, that your client was subject to an ongoing anti-dumping order at a dumping margin of 10%, right? And comes along the first annual review. And under Judge Stansell's ruling, your client says, hmm, we're smart here. What we're going to do is we're going to go with our abacus or adding machine or our computer. We're going to figure out exactly how far we need to drive that home price down so as to have a zero dumping margin. Because we know exactly what we sold the stuff for in the United States. And so they know exactly how much they've got to give back. And so they go around to pick the number of people that they dealt with in the home market. And they say, you get $10, you get $20, you get $60, you get $90, you get $100. And they just stick it in there. And guess what? Comes up to be a zero dumping margin. Okay. My response to that. And that Stansell authorizes that, correct? I don't think Judge Stansell's decision permits manipulation because commerce. How so not? How so not? Let's assume, for example, you're representing the hypothetical I just made. Well, commerce. And you've got your folks in the home market with rebates after the fact, years after the fact, to go adjust all the prices to come up with a zero margin. I don't read Judge Stansell's decision as rigidly as requiring, in all cases, that as long as you can demonstrate a rebate was actually paid, the nature of the thing was a rebate. Because commerce, remember, has the inherent authority to maintain the integrity of its proceedings. And if commerce determines that there is evidence of manipulation after the fact going on, commerce has the discretion to say, no, we're not satisfied that you've demonstrated that these are rebates that were not intended to manipulate the margin, as opposed to finding that the rebates were part of what the company did in the normal course of business. If that information, you know, so if there becomes suspicion of manipulation of the margin, commerce definitely has the discretion to probe that, to develop the record around it, to decide how far to probe it, whether or not to try to attempt to verify it. But certainly at all times, if commerce senses that there's elements of behavior intended to damage the integrity of the proceeding, commerce certainly has the discretion to address that. Okay. Let's see. I would also, as a follow-up point on the Kohler decision, I disagree that it requires the Commerce Department to blindly accept rebate information. I don't think that's what that case said, and I don't think that's what the reasoning for the decision was, given that this underlying discretion. Well, it's probably only going to find out in a case in which there isn't, someone is trying to rely on Kohler, yet there is evidence of manipulation. I agree with you. I mean, Judge Stanzow doesn't, the word manipulation doesn't exist in that opinion. Correct. And yet he knew full well what was driving the regulation, what was driving the concern of commerce. And he was just as aware of the preceding cases as you and I are, in which the fear of manipulation was what was driving commerce's activity and its interpretation. Right. And that is certainly what happened in the Koenig and Bauer-Albert decision, in which commerce found that the company had engaged in an amending sales contract after the petition was filed. There were 394 cases in which that's how commerce dealt with it. Right. And then they got themselves, with the regulation, they got themselves into this soup that resulted in Stanzow's opinion. Now, what's your judgment about the lay of the land going forward with the new regulation? My judgment? Well, it's certainly, if companies want to have their rebates accepted by commerce moving forward, I think they're going to have to document rebates perhaps more rigidly, more heavily. I can't speak for every industry. At the time of sale? Or now the current regulation is saying that the rebate has to be put in place at the time of sale? They're saying that parties have to have knowledge of the rebate at the time of sale, knowledge of the terms and conditions at the rebate. Now, it's not saying in 100 percent of cases, but it's a factor that commerce will heavily consider when assessing rebate information that's reported by the parties. They're basically saying any after-the-sale adjustment, you have to satisfy us, and that's legit. Correct. That's the bottom line in what they're saying. Document it. Has that regulation been challenged yet, as far as you know? Pardon me? Has that regulation been challenged yet, as far as you know? No, I don't think it has. We're still fighting about the old regulation at this point. I don't know the new one. And, you know, I have to say, in my experience representing respondents for the last 15 years, that rebates are not a very common thing in general. They do happen in certain industries more than others, but it's not, I would say, it's not a real common practice. It's an every once in a while sort of issue that can crop up. So I think that may be part of the reason why there isn't a whole lot of rebate-related precedent. I mean, there is some. And certainly, you know, the Koenig and Bauer, Albert, and... Other than prosperity, there don't appear to be a number of these cases in the pipeline. I think prosperity is it. I think that was the last one. That was the last investigation they applied the old regulation to. That's the very last one. Unless you're aware of one. I don't think so. Well, there will be, but the annual reviews of extant dumping orders will now be reviewed under the new regulation. That's the effective date. I'm just trying to get my mind around the size of where this case fits. This is kind of the... I think the shoe doesn't fit. These strings of cases, tension, steel, and prosperity, is sort of the last gasp of the old regulations. They're not being applied anymore. I think part of the reason why, too, that... I mean, just because commerce had a practice of requiring... Had a very long-standing practice, let's say, of requiring knowledge of the rebate terms and conditions at the time of sale, doesn't necessarily mean that that was a consistent... Or that was an interpretation of the regulations that was consistent with the regulations themselves. It just so happens that when someone finally challenged that practice in light of the language of the regulations, commerce found itself getting overturned, its requirement of the knowledge overturned. And we have two CIT judges now in agreement on that. Your time is up. Do you want to add a wrap-up sentence? No, thank you very much for this opportunity. Thank you. Thank you, Ronald. Just quickly to your question about the verification report. I would direct your attention to page 6 of the verification report. It's APPX001487. Some of that information is proprietary, obviously. But it does talk about what commerce looked at at verification. They did verify that rebates were paid. My assertion is that what they weren't able to verify is when there were price adjustments on the coil, that it translated into particular payments out. And, in fact... And the problem for you on that issue is you're claiming a substantial evidence standard of review. And the question is, well... It's basically, there were some chicken scratches in the dirt. And the question is, do those chicken scratches all add up to the rebate actually got paid to this guy at this time or not? Correct, Your Honor. And to your question about manipulation, you know, this was a situation where when these cases were filed, this was one of nine cases filed at the same time. There were allegations of critical circumstances that went along with those. And within those allegations of critical circumstances, part of that critical circumstances petition is to say, there was knowledge that these cases were coming early on, and that that's why we filed the critical circumstances petition itself, to address those types of things. So anybody, any respondent paying attention would know they would need to adjust things to, quote, unquote, dump-proof their sales to prevent that. And, in fact, again, going back to the verification report, where it says, and this is public, you know, rebates on sales of OCTG since 2009. Tension clarified that it had granted rebates on sales made in 2009, but that the rebates weren't paid until much, much later. So it's granting a rebate, but then holding onto that money for a long period of time, and then suddenly granting it all at once just before the case was filed. In our mind, that is manipulation. There was substantial evidence for Commerce to deny the entire program. Instead, what they did here was say, you didn't satisfy the terms. There wasn't a legitimate rebate program, at least for a portion of these sales, and denied those sales. And you're correct, Your Honor. Judge Stansu's interpretation of the regulation would make, it would be very easy to manipulate. In fact, in light of that, Commerce then changed its regulations and did it quickly. But fortunately, those times have passed. Yes. And we're now moved into a happy earning ground. I hope so, Your Honor. If there aren't any other questions, I'll rest. Thank you, Weed. Thank you. We thank counsel, and the case is submitted. All rise. The Honorable Court is adjourned until tomorrow morning. It's an o'clock a.m. Thank you. Thank you.